## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STEPHANIE L. TAVERNA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-0129-CVE-FHM |
| | ) | |
| FIRST WAVE, INC., | ) | |
| FIRST WAVE MRO, INC., | ) | |
| BEN CLARK, and | ) | |
| ED CLARK, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Now before the Court are the following motions: Plaintiff's Appeal of Discovery Ruling by United States Magistrate Judge (Dkt. # 54); Motion for Summary Judgment and Brief in Support of Defendant First Wave, Inc. (Dkt. # 55); and Motion for Summary Judgment of Defendants First Wave MRO, Inc., Ben Clark, and Ed Clark (Dkt. # 56). Plaintiff filed an amended complaint (Dkt. # 30) alleging claims of sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. (Title VII),[1] as well as state law claims of intentional infliction of emotional distress and wrongful discharge in violation of an Oklahoma public policy against

---

[1] Plaintiff asserts that each defendant violated Title VII and she asserts her sexual harassment and retaliation claims against each defendant. See Dkt. # 30, at 3-6. However, she does not raise any argument in her response to defendant's motion for summary judgment that defendants Ben and Ed Clark should be held individually liable or that they engaged in conduct separate and apart from that of plaintiff's employer. The Court notes that plaintiff has asserted Title VII claims against Ben and Ed Clark, but finds no reason to provide a separate analysis of plaintiff's Title VII claims against these defendants in this Opinion and Order.

defendants.[2]  She also asserts a claim of intentional interference with contract and prospective economic opportunity against defendants Ben and Ed Clark.  All defendants seeks summary judgment as to each claim against them.

## I.

Stephanie L. Taverna was employed by First Wave MRO, Inc. (First Wave) beginning in August 2007.  She originally worked in the sales and marketing department, but was later transferred to the customer service department.  Taverna's direct supervisor was Beth Turman.  On August 5, 2007, Taverna signed a statement representing that she had received and reviewed a copy of the employee handbook.  Dkt. # 57-10, at 8.  The employee handbook prohibits discrimination based on race, color, religion, sex, national origin, age, and genetic information, and includes a separate section concerning the procedure for reporting and investigating claims of sexual harassment.  Dkt. # 57-1, at 1-2.  Any employee who claims to be the victim of sexual harassment by a coworker should:

> report the matter to his/her supervisor or to the Human Resources Department.  An investigation of all complaints or reports of sexual harassment will be undertaken immediately.  Any such complaint will be handled in a confidential manner.  The investigation generally will include a private interview with the person filing the complaint, with other individuals believed to have helpful information, and with the person alleged to have committed the harassment. Once the investigation is completed, the Company will report the results of the investigation to the employee filing the complaint and the person implicated in the complaint.

Id. at 2.  The employee handbook also provides a disciplinary procedure for repeated absenteeism and tardiness, and hourly and salaried employees are both required to follow the same attendance

---

[2]     The Oklahoma Supreme Court recognized a claim for wrongful discharge in violation of an established Oklahoma public policy in Burk v. K-Mart Corp., 770 P.2d 24 (Okla. 1989), and this type of claim has become known as a Burk tort. The Court will refer to plaintiff's state law employment discrimination claim as a Burk tort in this Opinion and Order.

policies.  Id. at 3.  The handbook recommends the following discipline for an "infraction"[3] for either

tardiness or an unexcused absence:

> First infraction - verbal warning
> Second infraction - written warning
> Third infraction - final written warning
> Fourth infraction - subject to discharge

Id. at 4.  However, this procedure is advisory and "steps in the discipline process may be repeated,

omitted, or taken out of sequence" at the discretion of First Wave.  Id.

Taverna had attendance and tardiness problems throughout her employment.  When her

employment began, Taverna was scheduled to arrive at work at 8:00 a.m.  Dkt. # 57-5, at 6.

Taverna's start time was moved back to 8:30 a.m. after she repeatedly failed to arrive on time for

work.  Id.  Taverna still had difficulty arriving on time and this was noted in her annual review.  Dkt.

# 57-6, at 3.  On July 22, 2008, Turman issued a verbal warning to Taverna for excessive tardiness

and advised Taverna that she would review the matter in 30 days to determine if Taverna's

attendance had improved.  Dkt. # 57-7, at 1-2.  Taverna continued to arrive late for work and she

received a final written warning on September 29, 2008.  Dkt. # 57-9.  Turman noted that "[Taverna]

comes in 10-15 minutes late almost every day.  Friday, 9/26/08 she did not call in at all.  Supervisor

called her at 9:30 and woke her up.  She said she was Sick and not coming in at all that day.

[Taverna] must be on time everyday from here forward."  Id.  Taverna was advised that a "similar

violation of company policy will be cause for further discipline up to and including termination."

Id.  Taverna states that she knew that she was supposed to arrive at work "around" 8:30 a.m., but

---

[3]     An infraction is defined as an unexcused absence or three incidents of unexcused tardiness
of less than one hour each.  Id. at 3.

claims that salaried employees were held to less rigid standard for tardiness and she was permitted to work "erratic" hours.  Dkt. # 63-1, at 2.

Taverna claims that, on May 1, 2009, she was meeting with Ben Clark, the Chief Executive Officer of First Wave, and a coworker, Dennis Rose, in Rose's office in the engineering department, and Ben Clark "made a comment to [Rose] . . . about having the clap and asking him if it hurt when he -- when he peed.  Then [Ben Clark] turned to me and says, 'Reminds me of the time I had to perform that abortion on [Taverna] in Ft. Lauderdale.  I'll never use that hanger again.'" Dkt. # 57-2, at 5.  Rose is the engineering director of First Wave and there were rumors circulating that Taverna and Rose were having an affair.[4]  Taverna did not report Ben Clark's comment to her supervisor or anyone else at First Wave until late June 2009.  Ben Clark asked another employee, Jennifer McCormick, to speak to Taverna about the alleged affair around middle or late June 2009, and McCormick advised Taverna to end the affair.  Dkt. # 57-2, at 15-17.  Ben Clark testified in his deposition that he spoke to Rose, and Rose admitted that he was having an extra-marital affair with Taverna.  Dkt. # 57-5, at 12-14.

On June 30, 2009, Taverna failed to arrive at work on time and Turman called Taverna to find out why she was not at work.  Taverna told Turman that she overslept.  Dkt. # 57-11.  Taverna said that she had not been sleeping well because of an offensive remark made by Ben Clark about five or six weeks earlier.  Id.  Taverna acknowledges that she did not attempt to make a formal complaint of sexual harassment to Turman or to anyone else at First Wave following her

---

[4]    Plaintiff does not dispute that there were rumors about her alleged affair with Rose but she claimed a Fifth Amendment privilege when asked at her deposition about the affair.  Dkt. # 57-2, at 21.  It is not necessary to determine whether plaintiff and Rose were actually having an affair, but the existence these rumors is relevant to plaintiff's sexual harassment claim.

conversation with Turman.  Dkt. # 57-2, at 28-29.  Taverna states that she spoke to a coworker, Steve Reagan, in late June 2009 in a stairwell, but it is not clear if this conversation occurred before or after Taverna's meeting with McCormick and her absence on June 30, 2009.  She did not tell Reagan the precise contents of Ben Clark's alleged statement, but she told Reagan that Ben Clark made a statement that upset her and was "a little embarrassing."  Dkt. # 57-2, at 12.  She also told Reagan that she was thinking about contacting an attorney about Ben Clark's conduct.  Id.  On July 1, 2009, Jayne Elias from the human resources department contacted Taverna at Ben Clark's request, because Ben Clark believed that Taverna was upset about something.  Ben Clark had also been informed by Reagan that Taverna was "making claims that [Ben Clark] had said something inappropriate and that she was bragging that she had a lawyer."  Dkt. # 57-5, at 3.  Taverna told Elias that Ben Clark made a "distasteful" statement, but Taverna did not describe the statement in detail or appear to be upset.  Dkt. # 57-3, at 8.  Taverna also stated that "she felt like she was walking on eggshells at work" because of rumors of her affair with Rose.  Id. at 9.

Elias spoke to Ben Clark, and he denied making any inappropriate comments.  Elias and Ben Clark met with Taverna later on July 1, 2009.  Taverna claims that Ben Clark denied making the abortion statement.  Dkt. # 57-2, at 46.  Ben Clark recalls that he that asked Taverna why she was bringing up the abortion statement if it occurred about two months before and Taverna did not respond to his question.  Dkt. # 57-5, at 4-5.  Taverna agreed to take steps to "quell" rumors of an affair with Rose, such as taking breaks at different times and avoiding contact with certain co-workers.  Dkt. # 57-2, at 48.  Taverna sent a letter to First Wave stating that she filed an Equal

Employment Opportunity Commission (EEOC) charge on July 2, 2009.[5]  Dkt. # 57-18.  Elias investigated Taverna's allegations of sexual harassment.  The only evidence Elias found that supported Taverna's claim was the oral statement of Rose that he had heard the abortion statement. However, Rose would not sign a written record of interview or even make an on-the-record statement about this issue. Dkt. # 57-3, at 14-15.  Consequently, Elias gave Rose's oral statement little or no weight in her investigation and she found no other evidence supporting  Taverna's allegations.  Elias determined that Taverna's claim was false, but she did not reach this conclusion until she had completed her investigation.  Id. at 11-12.

Taverna met with Ed Clark, President of First Wave and Ben Clark's father, on July 8, 2010 in a conference room at First Wave.  Ed Clark states that he discussed rumors that had been circulating at the workplace, and Taverna informed him that she was uncomfortable at First Wave. Dkt. # 57-17, at 2-3.  He also states that he told Taverna that First Wave would allow the EEOC charged to "take its course" and she should continue to work as usual.  Id. at 3.  Taverna testified in her deposition that Ed Clark suggested that they should not be talking if she intended to pursue her EEOC charge, and the meeting ended.  Dkt. # 57-2, at 54.

On Friday, July 17, 2010, Taverna expressed concern that her coworkers were being interviewed about an incident that occurred at the Elks Club the previous night.  Some employees of First Wave went to the Elks Club after work on July 16, 2009, and reported that there was an incident involving Rose and Taverna.  Dkt. # 57-3, at 17.  The evidence suggests that Rose and

---

[5]     On August 21, 2009, plaintiff signed her formal EEOC charge alleging a sexual harassment claim against First Wave. Dkt. # 57-16.  However, the parties agree that plaintiff initiated the process of filing a charge on July 2, 2009, and use July 2, 2009 as the relevant date for plaintiff's retaliation claim.  The Court will refer to July 2, 2009 as the date plaintiff engaged in protected activity, even though the formal charge was not filed until August 21, 2009.

Taverna may have argued because Taverna was "hanging on some other guy." Dkt. # 57-17, at 8. However, Taverna denies that she had a fight or argument with Rose. Dkt. # 57-2, at 42. Carla Dostal, a First Wave employee working in the quality control department, was sitting at a table with Taverna and reported that she heard Taverna say "he will pay, I have his balls in a vise, and I have a damn good lawyer." Dkt. # 57-14. When Dostal asked who Taverna was talking about, Taverna stated that was referring to the "VP @ First Wave." Id. Dostal believed that Taverna was referring to Ben Clark. Dkt. # 57-3, at 17. Taverna denies making any such statement about Ben Clark. She states that Elias began interviewing employees about the incident, in particular about Taverna's statement concerning Ben Clark, and she found the investigation was "very embarassing." Dkt. # 63, at 10. Taverna called Ed Clark and asked him to intervene. Dkt. # 57-2, at 55.

Ed Clark went to First Wave's Bristow facility on the morning of Monday, July 20, 2009 before Taverna was scheduled to arrive at work. He testified that Taverna was late for work and he told Elias "this is it, forget it, let her go." Dkt. # 57-17, at 7. Taverna denies that she was late for work on July 20, 2010. Elias spoke to Taverna about her tardiness, and Taverna claimed that she was delayed by traffic. Dkt. # 57-3, at 19. Elias noted that Taverna had repeatedly arrived late to work in July 2009, in addition to her unexcused absence on June 30, 2009. Id. at 18. Elias informed Taverna that her employment was terminated.[6] The record shows that Ed Clark made the decision to terminate Taverna's employment and Elias conveyed the information to Taverna. Id. at 19; Dkt. # 57-17, at 7.

---

[6] Plaintiff claims that there is a factual dispute as to whether Elias or Ed Clark actually met with plaintiff and terminated her employment. However, the deposition testimony cited by plaintiff clearly shows that Ed Clark made the decision to fire plaintiff and Elias delivered the information to plaintiff. See Dkt. # 63-12, at 6-7; Dkt. # 64-2, at 7.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986); <u>Kendall v. Watkins</u>, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  <u>Celotex</u>, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" <u>Id.</u> at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Id.</u> at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. <u>Garratt v. Walker</u>, 164 F.3d 1249, 1251 (10th Cir. 1998).

8

**III.**

Defendants seek summary judgment on each of plaintiff's claims.  First Wave argues that it is entitled to summary judgment on plaintiff's employment discrimination claims under state and federal law, because there is no evidence raising an inference that plaintiff was sexually harassed or fired in retaliation for filing an EEOC charge.  Dkt. # 57, at 19-27.  Defendants Ed Clark and Ben Clark request summary judgment on plaintiff's state law claims of intentional infliction of emotional distress and intentional interference with contract or prospective economic advantage.  Id. at 27-29.  Defendant First Wave, Inc. argues that it was not plaintiff's employer and it can not be held liable for any discriminatory conduct alleged by plaintiff.  Dkt. # 55.  Plaintiff does not oppose First Wave, Inc.'s motion for summary judgment and stated that she would voluntary dismiss her claims against this defendant.[7]  Dkt. # 65, at 1.  Plaintiff has also filed an appeal of the magistrate judge's order on her motion to compel, and the appeal is also at issue.

**A.**

Plaintiff claims that the magistrate judge failed to consider all issues raised in her motion to compel (Dkt. # 28), and improperly limited his review to issues raised in plaintiff's reply in support of her motion to compel.  Dkt. # 54, at 3.  Defendants have not responded to plaintiff's appeal.

Federal magistrate judges may hear and determine any pretrial matter that is not dispositive of the case and must enter a "written order setting forth the disposition of the matter."  28 U.S.C.

---

[7]     The parties have not filed a stipulation of dismissal of plaintiff's claims against First Wave, Inc., and those claims are still pending.  The Court has reviewed First Wave, Inc.'s motion for summary judgment (Dkt. # 55) and plaintiff's response (Dkt. # 65), and finds that the motion for summary judgment should be granted.  First Wave, Inc. was not plaintiff's employer and plaintiff concedes that she has no claim against this defendant.  Therefore, the Court will enter summary judgment in favor of First Wave, Inc.

§ 636(b)(1); Phillips v. Beierwaltes, 466 F.3d 1217, 1222 (10th Cir. 2006).  Fed. R. Civ. P. 72(a)

provides that an order of the magistrate judge on a pretrial matter that is not dispositive shall be set

aside or modified only if the order is found to be clearly erroneous or contrary to the law.  Under

this standard, the district court should affirm the magistrate judge's order "unless it 'on the entire

evidence is left with the definite and firm conviction that a mistake has been committed.'" Allen v.

Sybase, Inc., 468 F.3d 642, 658 (10th Cir. 2006) (quoting Ocelot Oil Corp. v. Sparrow Indus., 847

F.2d 1458, 1464 (10th Cir. 1988)).

     Plaintiff's motion to compel lists 33 "discovery disputes," and each dispute concerns

defendant's alleged failure to fully respond to a particular discovery request.  She argued that

defendants' representations that all relevant documents had been produced were "incredulous" or

"ludicrous."  Dkt. # 29, at 7, 8.  Defendants responded that they had produced all documents except

"those documents which are communications directly with its [sic] attorneys . . . ."  Dkt. # 33, at 7.

Plaintiff's reply identified certain disputes which she believed had been resolved.  Plaintiff argued

that defendants arbitrarily limited the scope of her request for employee rules by producing only a

complete copy of the employee handbook. Dkt. # 38, at 1-2.  She claimed that defendants' assertion

that they were not withholding discoverable information was not credible, and defendants should

be required to produce a privilege log to the extent that any withheld documents were allegedly

protected by attorney-client privilege.  She also argued that defendants should be compelled to

respond to discovery requests concerning when defendants knew of plaintiff's allegations of sexual

harassment and that defendants financial records were relevant to plaintiff's demand for punitive

damages.  Id. at 2-3.  The magistrate judge issued an opinion and order (Dkt. # 45) ruling on each

of these issues, and he granted in part and denied in part plaintiff's motion to compel.  He interpreted

10

plaintiff's reply as a representation that all other discovery disputes not mentioned in the reply had been resolved by agreement of the parties.  Dkt. # 45, at 1.

The magistrate judge's opinion and order was not clearly erroneous or contrary to law, and plaintiff's appeal should be denied.  Defendants' response to plaintiff's motion to compel was based on their assertion that they had produced all relevant and unprivileged information.  Plaintiff's reply pointed out certain discovery responses that plaintiff believed were still incomplete, but she did not generally challenge defendants' assertion that they had complied with plaintiff's discovery requests. The Court has reviewed plaintiff's motion to compel and her reply, and finds that it was reasonable for the magistrate judge to limit his review to those issues identified in plaintiff's reply.  Plaintiff made no attempt to renew her motion to compel or seek reconsideration of the magistrate judge's opinion and order and, instead, filed a vague appeal that does not specifically identify any issue that the magistrate judge failed to consider.  Plaintiff's appeal does not provide sufficient specificity for the Court to recommit any matter to the magistrate judge for further proceedings, and the Court declines plaintiff's request recommit all or nearly all of her motion to compel to the magistrate judge for a general rehearing of her motion to compel.[8]

**B.**

Plaintiff claims that she was subjected to sexual harassment and the harassment was so severe and pervasive that the workplace qualifies as a hostile work environment.[9]  She claims that

---

[8]     Plaintiff has also requested an expedited ruling on her appeal and leave to supplement her summary judgment response if the appeal is granted.  Dkt. # 77.  The Court finds that plaintiff's requests are moot based on the denial of her appeal.

[9]     Plaintiff does not allege sexual harassment on a quid pro quo theory, and the Court will consider plaintiff's sexual harassment under a hostile work environment theory only.

Ben Clark engaged in a series of incidents contributing to a hostile work environment, but argues that the abortion statement, standing alone, is sufficient to create a genuine issue of material fact that a hostile workplace existed. First Wave responds that plaintiff has not produced evidence of severe and pervasive sexual harassment, and it is more likely that plaintiff felt uncomfortable in the workplace due to rumors of her affair with Rose. Dkt. # 57, at 20.

Title VII prohibits an employer from discriminating against an individual because of an individual's sex, and unlawful discrimination may take the form of a hostile work environment. 42 U.S.C. § 2000e-2(a)(1); Meritor Savings Bank, FSM v. Vinson, 477 U.S. 57, 65 (1986). To prevail on a sexual harassment claim under a hostile work environment theory, a plaintiff must prove four elements: "(1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." Dick v. Phone Directories Co., Inc., 397 F.3d 1256, 1263 (10th Cir. 2005) (quoting Seymore v. Shawver & Sons, Inc., 111 F.3d 794, 797-98 (10th Cir. 1997)).

The Tenth Circuit has established that the severe and pervasive nature of alleged sexual harassment must be established under objective and subjective standards. Harrison v. Eddy Potash, Inc., 248 F.3d 1014, 1023 (10th Cir. 2001). Concerning the subjective aspect of a hostile work environment, the victim must show that she "subjectively perceive[d] th[at] environment to be abusive." Id. The objective component of a hostile work environment claim requires a plaintiff to present evidence that a "reasonable person" would find the same harassment so severe and pervasive that the workplace is objectively hostile or abusive. The Tenth Circuit has stated:

> Title VII's prohibition of harassment on the basis of sex forbids only behavior "so objectively offensive as to alter the 'conditions' of the victim's employment." [Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)].  Put otherwise, "conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview." *Id.*  Thus, the Supreme Court made clear that juries ought not find prohibited harassment merely based on ordinary socializing, such as intersexual flirtation. *Id.*  Instead, the jury is to judge the objective severity of the harassment from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.

Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007).  The Supreme Court has provided

several non-exclusive factors that district courts should consider to determine if alleged sexual

harassment is severe and pervasive:

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employees work performance.

Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).  Any psychological harm suffered by the

victim is also relevant, but this is simply another non-dispositive factor for a court to consider.  Id.

Plaintiff is a member of a protected class based on her gender and alleges that she was

subjected to harassment based on her gender, and First Wave does not dispute that the first three

elements of a sexual harassment claim may be present.  However, First Wave argues that the

workplace does not qualify as a hostile work environment under Tenth Circuit and Supreme Court

precedent.  Plaintiff claims that Ben Clark made an offensive remark about performing an abortion

on her and this statement is a sufficient factual basis to show that the workplace was so permeated

with offensive behavior that her sexual harassment claim should be submitted to a jury.  She also

cites three other alleged incidents of sexual harassment dating back to 2007: (1) Ben Clark allegedly

told plaintiff in 2007 to flirt with customers but "not to be a prick tease;" (2) plaintiff and Ben Clark

attended an industry convention and he told plaintiff to stand in front of the booth and "mess with

13

her skirt a little;" and (3) plaintiff alleges that an unidentified male coworker treated her in a demeaning manner and asked her to run errands. See Dkt. # 63, at 16-17. First Wave responds that the only evidence suggesting that Ben Clark made the abortion statement is plaintiff's own deposition testimony. Even assuming that Ben Clark actually made this statement, First Wave argues that plaintiff failed to report this incident to her supervisor or any other coworker in a timely manner, and there is other evidence suggesting that plaintiff only raised this issue to deflect attention from her affair with a married coworker.

There is conflicting evidence as to whether Ben Clark actually made the abortion statement. Plaintiff testified in her deposition that Ben Clark stated that he "had to perform an abortion on Stephanie in Ft. Lauderdale. I'll never use that hanger again." Dkt. # 57-2, at 5. Ben Clark does not remember making any such statement. Dkt. # 63-5, at 4-5. Another First Wave employee, Joan Pyle, may have heard Ben Clark make a statement "to the effect of [something] sexual towards [plaintiff]" in Rose's office, but she does not remember the contents of the statement and in her deposition she denied hearing any statement of sexual nature directed at plaintiff. Dkt. # 64-4; Dkt. # 67-2, at 3. Rose claims that he recalls Ben Clark make a statement containing the words "abortion," "coat hanger," and "Florida," but he does not recall the exact statement and would not confirm this in writing during Elias' investigation of plaintiff's allegations of sexual harassment. Dkt. # 57-3, at 14-15; Dkt. # 64-6, at 6. For the purpose of First Wave's summary judgment motion, the Court views the facts in a light most favorable to plaintiff and assumes that Ben Clark made the abortion statement.

However, the Court must also consider the circumstances under which plaintiff brought this alleged statement to light. Plaintiff waited almost two months before reporting Ben Clark's

statement to other co-workers, Reagan and Turman, and at that time she described Ben Clark's statement as a "little embarrassing."  Dkt. # 57-2, at 12.  Plaintiff's conversation with Reagan occurred near the same time as McCormick's conversation with plaintiff about her alleged affair with Rose, and First Wave argues that it was rumors of the affair, not Ben Clark's alleged statement, that actually upset plaintiff.  Id. (plaintiff spoke to Reagan in late June 2009 about Ben Clark's alleged abortion statement); Id. at 15-16 (plaintiff testified that McCormick spoke to her in late June 2009 about her alleged affair with Rose).  The Court also notes that plaintiff told her supervisor, Turman, of the abortion statement only after plaintiff overslept and failed to attend work on June 30, 2009.  This also creates an appearance that plaintiff was attempting to deflect attention from her ongoing tardiness and absenteeism.

Although the Court assumes that Ben Clark made the abortion statement, the evidence shows that plaintiff did not tell another coworker about the incident for almost two months and she did so only after rumors of her affair with Rose required intervention by First Wave.  The time delay between the alleged incident and plaintiff's reporting of the incident suggest that the conditions and terms of plaintiff's employment were not altered, and she was able to maintain her employment without any adverse affects after the alleged abortion statement by Ben Clark.  While she may have been personally upset by Ben Clark's statement, she has not identified any other incidents after the abortion  statement that contributed to an allegedly hostile work environment, other than pressure plaintiff may have felt from rumors caused by her own alleged affair with a married coworker and the risk that she could be fired due to repeated tardiness and absenteeism.  The evidence shows that plaintiff did not make a formal complaint of discrimination until she was approached by Elias, and Elias was unable to confirm that Ben Clark made the abortion statement.  This suggests that the

abortion statement did not interfere with her work performance and she did not view that statement as particularly severe or offensive.  Plaintiff has identified three other incidents that occurred well before Ben Clark's abortion statement, but she has produced no evidence that she viewed these statements as offensive at the time or that the incidents interfered with her ability to perform her job.

Viewing the evidence in a light most favorable to plaintiff, there is no possibility that a rational jury could conclude that any sexual harassment that occurred in the workplace was so severe and pervasive that it altered the conditions or terms of plaintiff's employment.  Even if the Court considers the other three incidents alleged by plaintiff, the alleged sexual harassment was not so severe or pervasive to constitute a hostile work environment.  Plaintiff downplays the significance of rumors of her affair and her ongoing attendance issues, but these factors clearly contributed to plaintiff's discomfort at work.  The Court finds that it is significant that plaintiff did not notify her supervisor of the abortion statement until Turman called plaintiff to ask why she was not at work, and plaintiff did not inform another employee that the statement upset her until McCormick approached plaintiff about rumors of her alleged affair with Rose.  Plaintiff could have found the abortion statement to be embarrassing, but this does not show that she was subjected to a hostile work environment.  See Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1366 (10th Cir. 1997) (plaintiff showed that her supervisor engaged in "unpleasant and boorish" conduct, but could not establish that the conduct created a hostile work environment).  A reasonable person in plaintiff's position would not have found the workplace hostile or offensive due to sexual harassment, and plaintiff has not established this essential element of a sexual harassment claim.

Plaintiff alternatively argues that First Wave failed to investigate her allegations of sexual harassment and First Wave had inadequate and confusing rules concerning the reporting of sexual

harassment.  Dkt. # 63, at 11-16.  Neither argument provides an independent basis for plaintiff's sexual harassment claim to be submitted to a jury.  Plaintiff is correct that an employer can be held liable under a hostile work environment theory "if the employer fails to take adequate remedial and preventative responses to any actually or constructively known harassment." Holmes v. Utah, Dep't of Workforce Servs., 483 F.3d 1057, 1069 (10th Cir. 2007).  However, plaintiff has not shown that there was a hostile work environment.  She has also not presented any evidence that she reported the alleged harassment to a management-level employee of First Wave before June 30, 2009.  The evidence shows that Elias, First Wave's human resources director, did not learn of plaintiff's allegations of sexual harassment until Elias approached plaintiff and asked if something was bothering her.  Upon learning of plaintiff's allegations, Elias initiated an investigation and interviewed plaintiff and other relevant witnesses and employees.[10]  Plaintiff attempts to create inconsistencies between the reporting requirements for sexual harassment and other types of discrimination, but she does not allege that she was misled by the guidelines or would have reported the alleged sexual harassment sooner if the guidelines had been clearer to her. The record shows that First Wave had workplace rules governing the reporting and investigation of sexual harassment, and Elias began an investigation as soon as she learned of plaintiff's allegations.  Plaintiff's arguments are not supported by the record and First Wave's alleged failure to investigate or have adequate anti-discrimination rules do not provide an independent basis for plaintiff to recover from First Wave.

---

[10]     Plaintiff repeatedly criticizes Elias' investigation, but there is no dispute that an investigation was initiated shortly after Elias became aware of plaintiff's allegations.  Plaintiff's dispute appears to be with Elias' methodology and conclusions, but she has not shown that First Wave ignored her allegations of sexual harassment or failed to conduct an investigation.

**C.**

First Wave argues that summary judgment should be entered in its favor on plaintiff's retaliation claim, because plaintiff can not establish that First Wave's legitimate, non-discriminatory explanation for plaintiff's termination was pretextual.[11]  Plaintiff has not directly responded to First Wave's argument, but the Court will consider other aspects of plaintiff's response that indirectly support denial of summary judgment as to her retaliation claim.

Under Title VII, it is unlawful for an employer to take any adverse action against an employee for filing a charge or reporting acts of alleged workplace discrimination.  42 U.S.C. § 2000e-3(a).  To prove a <u>prima facie</u> case of retaliation, plaintiff must show that: (1) she engaged in protected opposition to discrimination; (2) her employer took an adverse employment action against her; and (3) there is a causal connection between the opposition and the adverse action.  <u>Stover v. Martinez</u>, 382 F.3d 1064, 1071 (10th Cir. 2004).  The law is clear that reporting workplace discrimination to the EEOC is protected behavior.  <u>Anderson v. Coors Brewing Co.</u>, 181 F.3d 1171, 1178 (10th Cir. 1999); <u>McCue v. State of Kansas, Dep't of Human Resources</u>, 165 F.3d 784, 789 (10th Cir. 1999).  An employee may establish causation by showing that the adverse employment action occurred soon after the protected activity.  <u>Annett v. University of Kansas</u>, 371 F.3d 1233, 1239-40 (10th Cir. 2004); <u>Burrus v. United Tel. Co. of Kansas, Inc.</u>, 683 F.2d 339, 343 (10th Cir. 1982).  "Unless there is a very close temporal proximity between the protected activity and the

---

[11]     Plaintiff argues that First Wave did not seek summary judgment on her retaliation claim. Dkt. # 63, at 30 ("The Defendant ignores in its Motion for Summary Judgment the separate claims for retaliation.").  However, plaintiff is incorrect and defendant clearly requests summary judgment on plaintiff's retaliation claim. Dkt. # 57, at 25-27.  Consequently, plaintiff's response to First Wave's motion for summary judgment does not address the viability of her retaliation claim.

retaliatory conduct, the plaintiff must offer additional evidence to establish causation." O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1252 (10th Cir. 2001).  If the plaintiff can establish a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Pinkerton v. Colorado Dep't of Transp., 563 F.3d 1052, 1064 (10th Cir. 2009).  If the employer comes forward with a legitimate, non-discriminatory reason for its actions, the burden shifts to the employee to show that employer's stated reason is pretextual.  Id.

Plaintiff is a member of a protected class who engaged in protected activity and her employer took adverse employment action against her, and the first two elements of prima facie case of retaliation are present.  However, plaintiff must also demonstrate a causal connection between her protected activity and her termination.  Plaintiff states that she filed an EEOC charge against First Wave on July 2, 2009, and her employment was terminated on July 20, 2009.  For the purpose of ruling on First Wave's motion for summary judgment, the Court assumes that there is a close temporal proximity between the date plaintiff filed her EEOC charge and her termination and that plaintiff can establish a causal connection between the two events.  See Metzler v. Federal Home Loan Bank of Topeka, 464 F.3d 1164 (10th Cir. 2006) (gap of six weeks between filing of EEOC charge and termination was sufficient to establish causal connection for retaliation claim).  First Wave has come forward with a legitimate, non-discriminatory explanation for plaintiff's termination, because the evidence shows that Ed Clark terminated plaintiff's employment for repeated tardiness and absenteeism.  Dkt. # 57-17, at 7.

At this stage of the proceeding, the burden shifts to plaintiff to show that First Wave's explanation for terminating plaintiff's employment is pretextual.  Plotke v. White, 405 F.3d

1092,1099 (10th Cir. 2005); Salguero v. City of Clovis, 366 F.3d 1168, 1176 (10th Cir. 2004). "A plaintiff demonstrates pretext by showing . . . that the employer's proffered explanation is unworthy of credence." Stinnett v. Safeway, Inc., 337 F.3d 1213, 1218 (10th Cir. 2003) (quoting Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994)).  A plaintiff typically attempts to satisfy her burden by "revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" Mackenzie v. City & County of Denver, 414 F.3d 1266, 1278 (10th Cir. 2005) (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)).  A plaintiff's "mere conjecture" that the employer's explanation is pretext is not a sufficient basis to deny a motion for summary judgment.  Branson v. Price River Coal Co., 853 F.2d 786, 772 (10th Cir. 1988).

Plaintiff claims that she was a salaried employee who was not required to arrive at work at a particular time and, in any event, she was not tardy on July 20, 2009.  Dkt. # 63, at 7.  She asserts that Ed Clark was trying to protect his son, Ben Clark, by firing plaintiff, and her alleged tardiness on July 20, 2009 was pretext for discrimination.  Id. at 22.  She also argues that there is sufficient evidence suggesting that the decision had been made to terminate her employment before she allegedly arrived late to work on July 20, 2009, and First Wave did not follow its own employee handbook when determining whether plaintiff had enough unexcused tardies or absences to warrant termination of her employment.  Id. at 22-26.

None of these arguments meets plaintiff's burden to show that First Wave's stated reason for terminating her employment was pretextual.  The evidence shows that First Wave considered tardiness and absenteeism to be infractions for salaried employees, because the evidence submitted

by plaintiff shows that she was disciplined for tardiness long before the alleged discrimination. Dkt. # 63-2, at 1-4. Plaintiff received a verbal warning and a final written warning for "excessive tardiness" and was advised that she "must be on time everyday from here forward." Id. at 3. Contrary to plaintiff's allegations, there is no indication that salaried employees were exempt from the requirement to arrive on time. See Dkt. # 57-1, at 3 (employee handbook contains no exception from attendance requirements for salaried employees; Dkt. # 57-17, at 4-5 (Ed Clark testified that other First Wave employees were fired for excessive tardiness and absenteeism). Plaintiff claims that Ed Clark was trying to protect Ben Clark by terminating her employment, and this is shown by Ed Clark's conduct at a meeting with plaintiff on July 8, 2009. However, there is no dispute as to what Ed Clark said at that meeting, and plaintiff's argument is based on her interpretation of a particular statement by Ed Clark. Plaintiff claims that Ed Clark pressured her to dismiss her EEOC charge and it was "obvious" that Ed Clark wanted her to dismiss the charge, because he asked "what [First Wave] need[s] to do to make it go away." Dkt. # 67-1. There is no reasonable way to interpret Ed Clark's statement as a request for plaintiff to dismiss her EEOC charge. It appears that he was asking what actions First Wave could take to resolve plaintiff's allegations of discrimination, but he expressed no opinion on the merits of plaintiff's allegations and did not directly or impliedly ask plaintiff to dismiss her EEOC charge.

Plaintiff argues that her alleged tardiness on July 20, 2009 was not the true reason for her termination and that she actually arrived at work on time that day. Ed Clark and Elias testified that they honestly believed that plaintiff was late for work on July 20, 2009 and terminated plaintiff for that reason. When reviewing an employer's stated reason for taking employment action at the pretext stage, the issue is not whether the employee can disprove the employer's stated reason but,

instead, "whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." Rivera v. City & County of Denver, 365 F.3d 912, 924-25 (10th Cir. 2004) (quoting Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1318 (10th Cir. 1999)); see also Piercy v. Maketa, 480 F.3d 1192 (10th Cir. 2007) ("[e]ven a mistaken belief can be a legitimate, non-pretextual reason for an employment decision."). It is clear that plaintiff disagrees with Ed Clark's deposition testimony that she was late for work on July 20, 2009. See Dkt. # 67-1, at 10-11 (plaintiff denies that she was late for work but could not clearly state what time she actually arrived for work). However, even if Ed Clark was mistaken that plaintiff was late for work on July 20, 2009, this does not permit the Court to disregard First Wave's legitimate, non-discriminatory reason for terminating plaintiff's employment. EEOC v. Flasher Co., Inc., 986 F.2d 1312, 1322 n.2 (10th Cir. 1992). This also does not mandate a finding that First Wave's stated reason for terminating plaintiff's employment is pretextual. Tran v. Trustees of State Colleges of Colorado, 355 F.3d 1263, 1268-69 (10th Cir. 2004). Plaintiff admits that she and Elias discussed difficulties caused by road construction and Elias states that plaintiff relied upon the road construction as an excuse for her tardiness. Dkt. # 57-3, at 19; Dkt. # 67-1, at 13. It is unclear why plaintiff would need to explain that road construction delayed her drive to work unless she was actually late, and this tends to support First Wave's legitimate non-discriminatory explanation. While the Court makes no factual finding as to whether plaintiff actually was late on July 20, 2009, there is some evidence supporting her employer's legitimate, non-discriminatory explanation and this factual dispute does not independently show that the reason given for plaintiff's termination is pretextual. Plaintiff also argues that First Wave did not strictly follow its own employee handbook, because many of her prior unexcused absences and tardies no longer counted against plaintiff under the terms of the employee

22

handbook.  She is correct that an employer's non-compliance with an employee handbook can be evidence of pretext in some circumstances.  See Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1119 (10th Cir. 2007); Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).  However, plaintiff fails to note that she did not attend work on June 30, 2009, and First Wave noticed a pattern of tardiness in July 2009. Dkt. # 57-3, at 18.  Even if plaintiff did not receive a formal write-up for these tardies and absences, plaintiff has not shown that she was entitled, based on the employee handbook, to retain her job.

The Court finds that plaintiff has not met her burden to identify a genuine issue of material fact creating an inference that First Wave's legitimate, non-discriminatory reason for terminating her employment was pretextual.  Plaintiff's conjecture that First Wave intended to discriminate against her for filing an EEOC charge is not supported by any evidence, and she has not identified any reason why First Wave's stated reason for her termination is unworthy of belief.  Thus, First Wave is  entitled to summary judgment on plaintiff's retaliation claim.[12]

## D.

Defendants First Wave, Ben Clark, and Ed Clark assert that they are entitled to summary judgment on plaintiff's claim of intentional infliction of emotional distress, because plaintiff has no evidence that defendants engaged in extreme or outrageous conduct or that she suffered severe

---

[12]     Plaintiff has also alleged a Burk tort for wrongful discharge in violation of an Oklahoma public policy.  However, the Court has found no genuine issue of material fact giving rise to an inference that plaintiff was sexually harassed or fired in retaliation for filing an EEOC charge.  Plaintiff claims that her Burk tort may survive even if the Court grants summary judgment in favor of First Wave on her Title VII claims, but cites no authority to support this argument. Dkt. # 63, at 28-29.  Even if the Court were to assume that plaintiff's legal argument were correct, her Burk tort does not survive summary judgment under a sexual harassment or retaliatory discharge theory, because there is no genuine issue of material fact suggesting that either type of discrimination occurred.

emotional distress.  Dkt. # 57, at 28-29.  Plaintiff responds that Ben Clark's abortion statement, without more, was extreme and outrageous conduct, and her intentional infliction of emotional distress claim should be submitted to a jury.  Dkt. # 63, at 28.

Oklahoma courts have recognized a cause of action for intentional infliction of emotional distress, also known as the tort of outrage.  See Gaylord Entertainment Co. v. Thompson, 958 P.2d 128, 149 (Okla. 1998).  The action is governed by the narrow standards laid out in the Restatement Second of Torts, § 46. Id.  In Breeden v. League Services Corp., 575 P.2d 1374 (Okla. 1978), the Oklahoma Supreme Court explained:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'  The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

Id. at 1376.  To state a claim, a plaintiff must allege that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." Schovanec v. Archdiocese of Oklahoma City, 188 P.3d 158, 175 (Okla. 2008) (quoting Computer Publ'ns, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002)).  Under Oklahoma law, the trial court must assume a "gatekeeper role" and make an initial determination that the defendant's conduct "may be reasonably regarded as sufficiently extreme and outrageous to meet the Restatement § 46 standards." Trentadue v. United States, 397 F.3d 840, 856 n.7 (10th Cir. 2005) (applying Oklahoma law).  If reasonable persons could reach differing conclusions in the assessment of the disputed facts, the Court should submit the claim to the jury to determine whether the defendant's conduct could result

in liability. Id. The Court is to make a similar threshold determination with regard to the fourth prong, the presence of severe emotional distress. Id.

In cases arising out of the workplace, Oklahoma appellate courts have found that a defendant engaged in extreme and outrageous conduct only when that defendant intentionally and persistently engaged in a course of conduct that harmed the plaintiff. See Computer Publ'ns, 49 P.3d at 736 (claim should have been submitted to a jury when plaintiff presented evidence that harassment lasted more than two years and caused plaintiff to quit her job, move, and repeatedly change phone numbers); Miner v. Mid-America Door Co., 68 P.3d 212 (Okla. Civ. App. 2002) (employer's alleged failure to reassign the plaintiff after learning of workplace harassment, even if unreasonable, was not extreme and outrageous); Gabler v. Holder & Smith, Inc., 11 P.3d 1269 (Okla. Civ. App. 2000) (noting that workplace harassment rarely rises to the level of extreme and outrageous conduct); Mirzaie v. Smith Cogeneration, Inc., 962 P.2d 678 (Okla. Civ. App. 1998) (employer's conduct was not extreme and outrageous when, inter alia, the plaintiff's manager made derogatory sexual remarks about the plaintiff, woke plaintiff up in the middle of the night to do unnecessary work, and terminated him two hours before his wedding); Zahorsky v. Community Nat'l Bank of Alva, 883 P.2d 198 (Okla. Civ. App. 1994) (employer not liable for intentional infliction of emotional distress when an employee forced the plaintiff to have sex with him and employer failed to fire the employee, even though the employer allegedly knew about the conduct).

Defendants are entitled to summary judgment on plaintiff's intentional infliction of emotional distress claim, because plaintiff has produced no evidence that defendants engaged in extreme and outrageous conduct or that she suffered severe emotional distress. The Court has assumed for the purpose of defendants' summary judgment motion that Ben Clark made the abortion

statement, but this statement does not constitute extreme and outrageous conduct under Oklahoma law.  It may be an offensive remark that plaintiff found embarrassing, but plaintiff has cited no authority suggesting that this type of statement, standing alone, rises to the level of extreme and outrageous conduct.  The cases cited above suggest that Oklahoma courts would not find conduct that is significantly more reprehensible to be extreme and outrageous.  It is also plaintiff's burden to produce some evidence that she suffered severe emotional distress, but she has come forward with no such evidence.  At most, it appears that she found Ben Clark's statement offensive and it cause her some embarrassment, but this does not rise to the level of severe emotional distress.

### E.

Defendants Ben and Ed Clark also request summary judgment on plaintiff's claims of intentional interference with contract or prospective economic advantage.[13]  They argue that there is no evidence that plaintiff's employment was wrongfully terminated or that they were acting outside of the scope of their duties as First Wave employees at the time of plaintiff's termination. Dkt. # 57, at 27-28.  Plaintiff argues that Ed Clark made the decision to terminate her employment to protect his son from a claim of employment discrimination, and this raises a genuine issue of material fact requiring a jury trial on her claim of intentional interference with contract or prospective economic advantage.  Dkt. # 63, at 28.

To state a claim of intentional interference with business or contractual relations, a party must allege: (1) that the party "had a business or contractual right with which there was

---

[13]     The Court dismissed plaintiff's claim against First Wave and First Wave, Inc. of intentional interference with contract or prospective economic opportunity, because Oklahoma law does not permit an at-will employee to assert such claims against his or her employer.  Dkt. # 26, at 5-6.

interference;" (2) "[t]hat the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable;" and (3) "[t]hat damage was proximately sustained as a result of the complained-of interference." Mac Adjustment, Inc. v. Prop. Loss Res. Bureau, 595 P.2d 427, 428 (Okla. 1979); Navistar Int'l Transp. Corp. v. Vernon Klein Truck & Equip., 919 P.2d 443, 446 (Okla. Civ. App. 1994); see also Dill v. Edmond, 155 F.3d 1193, 1207-08 (10th Cir. 1998). A claim of tortious or intentional interference with contract may be brought only against a third party to the contract. Voiles v. Santa Fe Minerals, Inc., 911 P.3d 1205, 1210 (Okla. 1996); Ray v. American Nat'l Bank & Trust Co. of Sapulpa, 894 P.2d 1056, 1060 (Okla. 1994). The law is clearly settled in Oklahoma that an at-will employee may not bring a claim for tortious interference with contract against her employer. Gabler v. Holder & Smith, Inc., 11 P.3d 1269 (Okla. Civ. App. 2000). However, in Martin v. Johnson, 975 P.2d 889 (Okla. 1998), the Oklahoma Supreme Court held that an employee may bring a claim of intentional interference with contract or prospective economic opportunity against coworkers or former coworkers if the plaintiff could establish that the coworkers acted in bad faith and outside the scope of their employment at the time of the alleged contractual interference. Id. at 896-97.

Plaintiff has produced no evidence that Ben and Ed Clark were acting outside of the scope of their employment when plaintiff's employment was terminated. The evidence shows that plaintiff was terminated for repeated tardiness and absenteeism. Plaintiff claims that there is a factual dispute as to who actually fired plaintiff, because there is conflicting evidence suggesting that Elias or Ed Clark may have told plaintiff that her employment was being terminated. Dkt. # 63. However, this is not a genuine issue of material fact that precludes summary judgment on plaintiff's claim of intentional interference with contract or prospective economic opportunity. The evidence clearly

shows that Ed Clark made the decision to terminate plaintiff's employment but, contrary to plaintiff's assertion, this is not enough to show that he maliciously or wrongfully interfered with her employment.  Instead, plaintiff must show that Ben and Ed Clark were acting contrary to the interests of First Wave and in furtherance of their own personal interests.  <u>Martin</u>, 975 P.2d at 896.  Plaintiff has not attempted to make such a showing, and evidence of plaintiff's tardiness and absenteeism supports defendants' argument that plaintiff's termination was for legitimate business reasons.  Defendants Ben and Ed Clark are entitled to summary judgment on plaintiff's claim of intentional interference with contract or prospective economic advantage.

**IT IS THEREFORE ORDERED** that the Motion for Summary Judgment and Brief in Support of Defendant First Wave, Inc. (Dkt. # 55) and the Motion for Summary Judgment of Defendants First Wave MRO, Inc., Ben Clark, and Ed Clark (Dkt. # 56) are **granted**.  A separate judgment is entered herewith.

**IT IS FURTHER ORDERED** that Plaintiff's Appeal of Discovery Ruling by United States Magistrate Judge (Dkt. # 54) is **denied**, and Plaintiff's Motion for Expedited Ruling Regarding Pending Appeal from Magistrate Judge and Plaintiff's Motion Requesting the Court Defer Ruling on the Defendant's Motion for Summary Judgment until the Discovery Ruling is Made (Dkt. # 77) is **moot**.

**DATED** this 30th day of November, 2010.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT